UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALEXANDER MOLINA, | * |
| Petitioner, | * |
| v. | * Civil Action No. 14-cv-11104 |
| KELLY RYAN, | * |
| Respondent. | * |

## **MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Petitioner Alexander Molina ("Molina") was convicted of murder in the second degree, Mass. Gen. Laws ch. 265, § 1, unlawful possession of a firearm while not at work or at home, Mass. Gen. Laws ch. 269, § 10(a), and discharge of a firearm within five hundred feet of a building, Mass. Gen. Laws ch. 269, § 12E, for which he is currently serving a life sentence. Presently pending before this Court is Molina's petition for habeas corpus relief brought pursuant to 28 U.S.C. § 2254. [ECF No. 1]. Having reviewed the parties' submissions, and construing Molina's petition liberally because he is proceeding *pro se*, this Court DENIES Molina's petition for a writ of habeas corpus for the reasons explained below.

I. **BACKGROUND**

The following factual background is based on the summary of the facts as stated by the Massachusetts Supreme Judicial Court ("SJC") in Commonwealth v. Molina, 3 N.E.3d 583, 586–89 (Mass. 2014), which relied on the facts as laid out by the Massachusetts Appeals Court ("APC") in Commonwealth v. Molina, 969 N.E.2d 738 (Mass. App. Ct. 2012). "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the

judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Here, Molina does not argue that the facts the SJC's decision relied on were erroneous.

Around 5:00 p.m. on March 30, 2005, James Gauoette was shot to death near the intersection of Ruth and Salisbury Streets in New Bedford, Massachusetts. Three witnesses testified about their observations of the events surrounding the shooting. The APC referred to these witnesses by the pseudonyms of Alice, Barbara, and Claire. Alice testified that she heard gunfire and then saw a man in a mustard-colored T-shirt and light-colored jeans standing over the victim. The man was hitting the victim with an object. While Alice described the man as having a medium build with a tanned complexion, she could not see his face. The man ran down Salisbury Street.

Barbara testified that she was talking with Molina around 5:00 p.m. on the day of the shooting and that he was wearing jeans and a yellow shirt. When the victim approached Molina and said he was "just [t]here to talk," Molina went to his vehicle, which was parked nearby, retrieved a gun, and shot the victim. About ten to fifteen minutes later, after emergency personnel arrived, Barbara saw Molina again, but he had changed into a brown jogging outfit.

Claire testified that she heard a gunshot, looked out her window, and saw a man shoot a "kid" lying on the sidewalk four times. The shooting occurred at the corner of Ruth and Salisbury Streets. After the shooting, the man ran back across the street and handed the gun to another man, who threw it in a green car parked on Salisbury Street. Claire was familiar with Molina and testified that he had previously driven the green car. Claire also testified that about twenty or thirty minutes after the shooting, Molina came up Salisbury Street, went into a beige

2

house, and emerged wearing a brown sweatshirt. At Molina's trial, Claire identified him as the shooter.

At approximately 10:00 p.m. that evening, as the police prepared to tow a bluish-green vehicle located in the crime scene area, Molina and an acquaintance crossed the crime scene tape, approached an officer, and Molina advised that the vehicle was his. In response to the officer's inquiry, Molina indicated that his name was Orlando Figueroa. After the officer informed Molina that the vehicle was not his as it was registered to "Alex Molina," Molina gave his true name. Shortly thereafter, another officer asked Molina if he would go to the police station to answer some questions, and Molina agreed to do so. Officer David Brown transported Molina to the police station in a police vehicle. Molina was not handcuffed or under arrest.

At approximately 11:45 p.m., State Trooper Carmelo Serrano, Jr., and Detective Christopher J. Dumont began a videotaped interview of Molina in a windowless twelve foot by eight foot room at the police station. The interview was led primarily by Trooper Serrano who conducted the interview mostly in Spanish, the first language of both Serrano and Molina. Serrano began the interview by providing Molina with written <u>Miranda</u> warnings in Spanish. After Molina read the warnings out loud, the following exchange took place:

> Trooper Serrano: "OK. Do you understand your rights?"
>
> Molina: "Uh-huh, but I just said if I could call my attorney and I was told that it wasn't necessary; that I was coming just to be asked some questions."
>
> Trooper Serrano: "Uh-huh."
>
> Molina: "And that I just went to . . . I was sleeping and I get a call that my car was being taken and when I go there and I am told that I have to come here, that someone wants to ask me some questions . . . I don't know what happened because I truly don't know . . . my car was there because it was getting me [SIC] music equipment."

3

> Trooper Serrano: "OK, before . . . do you, do you want to speak with me now . . . I want to ask you some questions; do you want to speak with me now during this time? You understand your rights no?"
>
> Molina: "Uh-huh, yes I understand."
>
> Trooper Serrano: "Having understood your rights, you want to speak with me now?"
>
> Molina: "Whatever you say."
>
> Trooper Serrano: "OK, then if you please sign here; this is just that you were advised of your rights and that . . . you wish to speak with me now."
>
> Molina: "[T]hat is not that I am a witness for the town hall . . . I have no problem."
>
> Trooper Serrano: [A]nd, Detective Dumont, could you please sign . . . ."

After Serrano, Dumont, and Molina signed the <u>Miranda</u> waiver form, the interview began. Serrano first asked general questions, including where Molina lived and why his vehicle had been at the intersection of Ruth and Salisbury Streets. There was some joking and then the officers focused their questioning on what Molina had been doing earlier that day. Serrano had not yet told Molina about the shooting. Molina indicated that he had worn white "sweats" with red stripes to work earlier that day and had changed into the brown jogging suit he was wearing during the interview after showering at a friend's house. In response, Serrano asked "where is the . . . yellow sweatshirt that you had on this afternoon?"[1] Molina stated that he had worn the yellow shirt while he was working on his car in order to prevent his regular clothes from getting dirty and that it must still be in his vehicle. Molina also said that the yellow shirt had been lent to

---

[1] "New Bedford police officer Paul J. DeCosta had observed [Molina] in the intersection of Ruth and Salisbury Streets at around 5 P.M. on March 30, 2005, and had noted that he was wearing a yellow shirt." <u>Molina</u>, 3 N.E.3d at 588 n.3. The SJC concluded that "[i]t is reasonable to infer that Serrano learned that [Molina] had been wearing a yellow shirt from DeCosta." <u>Id.</u>

him by a man named Angelo, but that he did not know Angelo's last name. When Molina was asked for additional information regarding Angelo, he made his second reference to counsel, saying:

> "[I]s it mandatory that I mention a name? Because if I . . . truly, if I had known that this would be like this, I honestly would have brought an attorney because I truly don't even know what has happened; I haven't been informed of what has happened and I am being questioned about, really, I mean, it's like my rights are being violated because I am being questioned on something that I truly don't know . . . I mean because . . . ."

It was at this point in the interview that Serrano informed Molina that the officers were investigating a shooting. Not long thereafter, Molina made a third reference to counsel, saying, "honestly officer, you just tell me clearly if I need an attorney." Serrano responded that it was Molina's decision whether to get an attorney.

At approximately 1:40 a.m., the officers stopped questioning Molina for fifteen minutes. Prior to this break in questioning, the officers had remained seated across the table from Molina and Molina appeared relaxed. The officers' and Molina's voices were calm. After the break, however, the atmosphere in the interview room was markedly different. Serrano no longer sat while questioning Molina, but instead stood close to him, talking down at him. Serrano's voice was raised, and he interrupted Molina, not letting him finish his answers.

The interview concluded at 3:15 a.m. on March 31, 2005, at which time the officers drove Molina back to the area of Ruth Street and dropped him off. Later that same day, after speaking with at least one of the eyewitnesses to the shooting, the police arrested Molina and he was charged with Gauoette's murder.

In the state trial court, Molina filed a motion to suppress the statements he made during the police interview, arguing that he had invoked his right to counsel. The motion was denied

5

after an evidentiary hearing. Following his trial and conviction, Molina directly appealed his state court conviction and the denial of his motion to suppress to the APC. Molina, 969 N.E.2d at 738. The APC affirmed Molina's conviction on June 13, 2012. Id. Thereafter, Molina applied for further appellate review. Molina, 3 N.E.3d at 586. After granting Molina's application for further review, the SJC affirmed the decision of the APC on January 29, 2014. Id. The SJC concluded that Molina's interview was not custodial for at least the first two hours. Id. at 590. After the first two hours, Serrano's questioning became confrontational and coercive. Id. at 592. The SJC went on to conclude that (1) Molina's statements made during both the noncustodial and custodial portions of the interview were voluntary, and (2) even assuming Molina's Miranda waiver was not valid, the resulting error from admission of the custodial statements was harmless beyond a reasonable doubt. Id. at 590–91, 595.

On March 17, 2014, Molina filed the instant petition for federal habeas review of his state court conviction and memorandum of law in support. [ECF Nos. 1, 2]. Ryan filed an Answer on May 21, 2014 [ECF No. 10] and memorandum in opposition on October 23, 2014 [ECF No. 18].

## II. LEGAL STANDARD

A federal district court's review of a state criminal conviction is governed by Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. The AEDPA permits a federal court to grant habeas relief after a final state adjudication only if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This highly deferential standard of review applies "only to a 'claim that

6

was adjudicated on the merits in State court proceedings.'" Pike v. Guarino, 492 F.3d 61, 67 (1st Cir. 2007) (quoting Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001)). Here, there is no dispute that the SJC adjudicated Molina's claim on the merits. See Molina, 3 N.E.3d at 590–91, 595.

Under § 2254(d)(1), a state court decision is "contrary to" clearly established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law . . . [or] if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision is considered an unreasonable application of Supreme Court precedent if the state court identifies the correct legal rule but unreasonably applies it to the facts. Id. at 413. An unreasonable application requires "some increment of incorrectness beyond error." Norton v. Spencer, 351 F.3d 1, 8 (1st Cir. 2003) (quoting McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002)). A state court decision is "unreasonable if it is devoid of record support for its conclusions or is arbitrary." Id. (quoting McCambridge, 303 F.3d at 37). Thus, to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011).

## III. DISCUSSION

In support of his habeas petition, Molina argues that the trial court violated his due process rights when it admitted at trial the statements he made during his interview with Serrano and Dumont because he was in custody and invoked his right to counsel under Miranda. Ryan argues that the petition should be denied because Molina was not in custody when he made his

7

ambiguous references to an attorney. He argues, in the alternative, that even if Molina was in custody, he never effectively invoked his right to counsel, and further that even if Molina was in custody and did effectively invoke his right to counsel, the admission of his statements at trial was harmless error.

> **a. The SJC's determination that Molina was not in custody for purposes of <u>Miranda</u> at the time of his claimed invocations of the right to counsel did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law.**

The SJC held that "because the defendant's claimed invocations of the right to counsel were all made before the point at which the interrogation became custodial, the defendant did not effectively invoke that right." Molina, 3 N.E.3d at 592. In coming to this determination, the SJC determined that the interrogation became custodial at approximately 1:55 a.m., following the fifteen-minute break, at which point "Serrano's interrogation style was dramatically different." Id.

"In Miranda v. Arizona, the [Supreme] Court determined that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination required that custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." Edwards v. Arizona, 451 U.S. 477, 481–82 (1981) (citing Miranda v. Arizona, 384 U.S. 436, 479 (1966)). Following such warnings, "the interrogation must cease" if the accused requests counsel. Id. at 482 (quoting Miranda, 384 U.S. at 474). For Miranda rights to attach, however, a person "must be in 'custody.'" United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011) (citing United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011)). Where a suspect is not in custody, law enforcement officers "[are] not obligated to respect his attempted invocation of [Miranda] rights." United States v. Infante, 701 F.3d 386, 398 (1st Cir. 2012). Further, providing Miranda warnings prior to noncustodial questioning does

8

not trigger the Fifth Amendment right to counsel under Miranda. Cf. Rhode Island v. Innis, 446 U.S. 291, 297–98, 302 (1980) (finding Miranda warnings and custody, without interrogation, did not give rise to a defendant's rights under Miranda as Miranda requires "custodial interrogation"). In this case, Molina was interrogated because he was subjected to "express questioning" by Serrano and Dumont. See id. at 301 (holding interrogation includes express questioning, as well as "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect"). Thus, whether Molina's Miranda rights were violated turns on whether this interrogation took place while he was "in custody."

To determine whether a person was "in custody," "the court examines the circumstances surrounding the questioning and then it sees whether those circumstances would cause a reasonable person to have understood his situation to be comparable to a formal arrest." Guerrier, 669 F.3d at 6. This analysis requires examining several factors, "including '(without limitation) where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation.'" Id. (quoting United States v. Teemer, 394 F.3d 59, 66 (1st Cir. 2005)). "[T]he ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994) (citing California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)).

The SJC's determination that Molina was not in custody at the time of his references to counsel did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Supreme Court has held that a suspect who

9

voluntarily comes to the police station for questioning is not in custody "simply because the questioning takes place in the station house." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Here, the SJC found that Molina "voluntarily accompanied the police to the station for questioning." Molina, 3 N.E.3d at 591. The fact that the questioning occurred at the police station does not necessitate a finding that Molina was in custody.

The fact that Molina was never placed under arrest or handcuffed by Officer Brown on the way to the police station and was unrestrained during the interview with Serrano and Dumont also "suggests that the interaction was non-custodial." See United States v. Swan, 842 F.3d 28, 33 (1st Cir. 2016) (finding the fact that defendant "was not handcuffed or otherwise physically restrained at the [police station] . . . suggest[ed] that the interaction was non-custodial"). Additionally, the interview was at all times conducted by only two officers. The fact that "[t]he number of officers present during the interview[] was not overwhelming, lend[s] support to a finding that the questioning was non-custodial." Infante, 701 F.3d at 397.

Further, the SJC noted that although the interview was conducted in a relatively small room measuring only twelve feet by eight feet, "the interviewing officer's relaxed and informal tone in the beginning of the interview mitigated the room's small size." Molina, 3 N.E.3d at 591. This "relaxed and informal tone" included "small talk" and "joking" amongst Molina and the two officers. Id. In Guerrier, the First Circuit found that the defendant was not in custody where the atmosphere of the interview was "relatively calm and nonthreatening." 669 F.3d at 6; accord United States v. Crooker, 688 F.3d 1, 12 (1st Cir. 2012). The SJC also noted that prior to the fifteen minute break, the officers used a relaxed and informal tone, did not raise their voices, remained seated, kept the questioning and interaction nonaggressive, and that Molina appeared relaxed. Molina, 3 N.E.3d at 592. These factors also support the SJC's finding that the

questioning was non-custodial for the first two hours of the interview. United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999) (finding no custody where the officer "used a normal tone of voice" during questioning).

Finally, although the interview lasted approximately three and one-half hours, the SJC held that the first approximately two hours and ten minutes of the interview, from 11:45 p.m. on March 30, 2005, to 1:55 a.m. on March 31, 2005, was non-custodial. Molina, 3 N.E.3d at 592. While the Supreme Court has said that the fact that an interview lasted two hours may be a fact weighing in favor of a finding that the defendant was in custody during the interview, a state court's determination that other facts outweigh such a finding is not an unreasonable application of clearly established federal law for purposes of federal habeas review. See Yarborough v. Alvarado, 541 U.S. 652, 665 (2004) (finding reasonable application of clearly established federal law when state court held that a two-hour station house interview of a juvenile suspect did not amount to custody). Based on the foregoing, the SJC's determination that Molina was not in custody prior to 1:55 a.m. did not "result[] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[2]

Accordingly, because Molina's three references to counsel occurred during this initial hour and fifty-five minute period while he was not in custody, Molina did not effectively invoke

---

[2] Molina argues that "[t]he intent of the interrogating officers was to extract damaging information from [him]." The Supreme Court has held that an officer's "unarticulated [intent] has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 421–22 (1984). Furthermore, whether or not the officers' questions were designed to "extract damaging information from Molina" would not determine whether Molina was in custody for purposes of Miranda. Rather, although "words or actions . . . reasonably likely to elicit an incriminating response" constitute interrogation, see Innis, 446 U.S. at 301, as explained above, the question of whether Molina was "in custody" is an entirely separate issue.

his right to counsel under Miranda. See Bobby v. Dixon, 132 S. Ct. 26, 29 (2011) (per curiam) ("[The Supreme Court] has 'never held that a person can invoke his Miranda rights anticipatorily, in a context other than "custodial interrogation."'" (quoting McNeil v. Wisconsin, 501 U.S. 171, 182 n.3 (1991))); see also Infante, 701 F.3d at 398 (holding "[b]ecause [defendant] was not in custody, the officers were not obligated to respect his attempted invocations of [Miranda] rights").

> **b. Even if Molina was in custody for purposes of Miranda at the time of his claimed invocations of the right to counsel, the admission of his statements at trial was harmless.**

"[H]abeas petitioners . . . are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). "Trial error 'occur[s] during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it 'may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" Id. at 629 (quoting Arizona v. Fulminante, 499 U.S. 279, 307–08 (1991)). "An error is harmless unless it 'had a substantial and injurious effect or influence in determining the jury's verdict.'" Ayala v. Saba, 940 F. Supp. 2d 18, 21 (D. Mass. 2013) (citing Brecht, 507 U.S. at 631).

In the present case, the State's evidence of guilt was "certainly weighty." See Brecht, 507 U.S. at 639. "The main issue at trial was the identity of the shooter." Molina, 3 N.E.3d at 596. Barbara and Claire both testified at Molina's trial that they knew Molina personally and both identified him as the shooter. Molina, 969 N.E.2d at 740. Barbara testified that Molina was wearing a yellow shirt and jeans at the time of the shooting. Id. The third eyewitness, Alice, could not identify Molina and was not personally acquainted with him, but testified that the shooter was wearing a mustard-colored shirt and jeans. Id. Alice's testimony added credibility to

12

Barbara's testimony that Molina was the shooter. While the most damaging part of Molina's statement was his admission that he had worn a yellow shirt earlier in the day, the State did not need this statement, or Molina's other statements, to prove Molina's guilt beyond a reasonable doubt given the corroborated eyewitness testimony. Thus, even if admitted in error, the admission of Molina's statement did not have "a substantial and injurious effect or influence in determining the jury's verdict." See Ayala, 940 F. Supp. 2d at 21.

### c. Molina failed to raise the claim that his statements were involuntary.

Finally, although the SJC addressed the voluntariness of Molina's statements, Molina failed to raise a voluntariness claim in his petition. Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he petition must (1) specify all the grounds for relief available to the petitioner." Thus, this Court need not consider whether the statements made to Serrano and Dumont were voluntary. See McGee v. Medeiros, No. 15-11498, 2016 WL 837930, at *5 n.3 (D. Mass. 2016) (finding the petitioner's failure to raise a claim in his petition precluded the court from granting relief on that basis).

## IV. CONCLUSION

Accordingly, the Court DENIES Molina's petition [ECF No. 1].

**SO ORDERED.**

February 7, 2017                                             /s/ Allison D. Burroughs
                                                                       ALLISON D. BURROUGHS
                                                                       U.S. DISTRICT JUDGE